# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ROSALYN ALYSSA RODRIGUEZ,      *
*aka Michael A. Jones, Alyssa V. Hope,* [1]
Prisoner ID # 420-162,      *      Civil Action No. RDB-17-3827

Plaintiff      *

v.      *

NANCY K. KOPP, *State Treasurer of*      *
     *Maryland,*
LAWRENCE J. HOGAN, *Governor,*      *
JOHN DOE, *Executive Director, North*
     *Region,* [2]      *
STEVEN T. MOYER, *Secretary,*
DAYENA M. CORCORAN, *Commissioner,*      *
MAHBOOB ASHRAF, *Doctor,* [3]
FRANK B. BISHOP, *Warden,*      *
JORDAN TICHNELL, *Case Manager,*
     *
Defendants
     ***

## MEMORANDUM OPINION

The pro se Plaintiff Rosalyn Alyssa Rodriguez is suing Defendants pursuant to 42 U.S.C.

§1983. Rodriguez, who identifies as a transgender woman and is incarcerated at North Branch

Correctional Institution in Cumberland, Maryland, initiated this action by filing a verified

Complaint that alleges Defendants have provided inadequate evaluation and treatment for gender

dysphoria (GD)[4] and failed to protect her from harm in violation of her rights under the Eighth

---

[1] Rodriguez, aka Michael Jones, is also known to this Court as Latrina Marie Lopez and Sincere Allah. *See e.g. Jones v. Director John Doe,* Civil Action No. GLR-15-3065 (D. Md. 2016); *Jones v. Correctional Officer Cory Dolly, et al.,* Civil Action No. CCB-17-334 (D. Md. 2017). This Court will use feminine pronouns when referring to Rodriguez.
[2] Service was not obtained on the John Doe defendant, who is sued in his supervisory capacity and would be entitled to summary judgment. *See infra.* pp. 18-19.
[3] The Clerk shall modify the docket to spell Dr. Ashraf's name as it appears on his affidavit. (ECF 27-3).
[4] The Department of Public Safety and Correctional Services' (DPSCS) Operations Executive Directive OPS.131.001 (2016), "Identification, Treatment, and Correctional Management of and Inmate Diagnosed Gender Dysphoria," defines gender dysphoria as a "marked incompatibility between an individual's experienced or expressed gender

Amendment. She also claims that Tichnell has denied her right under Equal Protection Clause of the Fourteenth Amendment. (ECF 1, 2).[5] Rodriguez asks for preliminary[6] and permanent injunctive relief to send her to a transgender specialist outside the prison, to list her on prison records as a transgender woman, and to provide her with a bra, panties, and "female hygiene" Items. (ECF 1 at 8). She also seeks compensatory damages of $200,000 against each Defendant jointly and severally and punitive damages of $250,000 against each defendant jointly and severally. (ECF 1 at 9).

Defendants Nancy K. Kopp, Treasurer, Governor Lawrence J. Hogan, Department of Public Safety and Correctional Services (DPSCS) Secretary Stephen T. Moyer, Commissioner of Correction Dayena M. Corcoran, Warden Frank B. Bishop, Jr, and Division of Corrections (DOC) Case Manager Jordan Tichnell (collectively, the State Defendants), have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF 25). The Medical Defendant Mahboob Ashraf, M.D. has filed a Motion to Dismiss or Alternatively for Summary Judgment. (ECF 27). Rodriguez was notified that she may file Opposition Responses to Defendants' dispositive motions and include exhibits and declarations. (ECF 26, 29). The Court granted Rodriguez five extensions of time to do so, (ECF No. 28, 30, 31, 32, 33 ) but to date an opposition Response has not been received.

---

assigned gender causing significant distress or impairment in important areas of functioning such as school, work, social, and other similar areas." (ECF 25-3 at 9).

[5] Rodriguez filed a self-titled "Supplement Complaint" (ECF 3) to add additional Defendants and claims arising under the Religious Land Use and Institutionalized Persons Act, the First Amendment, and the Maryland Declaration of Rights. The Supplemental Complaint is more appropriately considered as a new Complaint and will be opened as a separate action.

[6] For preliminary injunctive relief, a litigant must show the likelihood of succeeding on the merits, that she is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in her favor, and that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.* 555 U.S. 7, 20 (2008). Rodriguez does not address these standards, and for reasons discussed in this Memorandum Opinion, fails to establish she is likely to succeed on the merits.

After considering the parties' submissions, this Court finds a hearing is unnecessary. *See*

Local Rule 105.6 (D. Md. 2018). For reasons discussed below, Defendants' Motions, will be

treated as Motions for Summary Judgment and GRANTED.

## BACKGROUND

Rodriguez[7] transferred to the Maryland DOC from Ohio via the Interstate Corrections

Compact (ICC) on November 19, 2013, as a male inmate. (Decl. of Warden Frank Bishop, ECF 2

¶11). Prior to transfer, Rodriguez was not enrolled in a certified Transgender Program and has not

provided any documentation of previous evaluation and or enrollment in a certified Transgender

Program. (Bishop Decl., ECF 2 ¶12). Rodriguez was evaluated and determined not to meet the

diagnostic criteria for DG and thus is not identified by the DOC as a transgender inmate as outlined

in Executive Directive OPS.131.001 "Identification, Treatment, and Correctional Management of

and Inmate Diagnosed Gender Dysphoria." (Bishop Decl, ECF 2 ¶¶ 1, 13; OPS.131.001, ECF 25-

3 at 8-19). Rodriguez remains assigned to NBCI as a male inmate. Bishop Decl., ECF 2 ¶¶ 11, 13.

This is Rodriguez's second action raising claims about lack of GD treatment and alleging

safety concerns. In *Jones v. Doe*, Civil Action No. GLR-15-3065 (D. Md. 2016),[8] filed October

8, 2015, the Honorable Judge George L. Russell found Defendants[9] did not act with deliberate

indifference to Rodriguez's (a/k/a Michael Jones) alleged need for medical treatment for GD

because she had not been diagnosed after evaluation as gender dysphoric. Further, Judge Russell

determined Defendants were not deliberately indifferent to a specific known risk of harm to

---

[7] Defendants' exhibits refer to Plaintiff as Michael Jones.
[8] A court may take notice of its own records. *See Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n. 1 (4th Cir. 1990); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (observing a court may take judicial notice of public records such as court documents without converting a motion to dismiss to one for summary judgment.)
[9] The Defendants in that case were correctional staff, mental health practitioners, medical providers, and correctional administrators. The correctional Defendants included Monica Wilson, Bryan Hoffman, Lauren Beitzel, Bruce Liller, Steven T. Moyer, Warden Frank Bishop, and Director John Doe, Maryland Department of Corrections. Defendant William Beeman, R.N. is a medical provider.

3

Rodriguez whose claims of sexual assault by other inmates were investigated and ultimately determined unsubstantiated. Rodriguez was informed that she did not meet the criteria for protective custody because she was then housed in a single cell. Based on this evidence, Judge Russell granted Defendants' Motion for Summary Judgment on May 26, 2016.

Notably, Rodriguez does not allege any changes since her last evaluation that would cause reconsideration of the determination that she does not meet GD diagnostic criteria or to raise new concerns about her housing and safety.

## I.    EVALUATION AND TREATMENT

Rodriguez filed this Complaint on December 27, 2017. She asserts her evaluation and lack of treatment for GD not comport with the standards recognized by the World Professional Association of Transgender Health[10] which provides for evaluation by an experienced practitioner and appropriate care. (ECF 1 at 3-4). She claims "upon information and belief" that the Maryland Department of Correction (DOC) has a "freeze frame" policy that holds if a person did not receive treatment prior to incarceration, treatment will not be provided in prison. Warden Bishop denies the Department of Public Safety and Correctional Services (DPSCS) has a "freeze frame" policy for transgender inmates. (Bishop Decl. ECF 2 ¶12). Rodriguez claims Governor Hogan approved the "freeze frame policy, which includes a "blanket ban on estrogen and hormone therapy." (ECF 1 at 4)." Rodriguez alleges Dr. Ashraf refused her multiple requests for GD evaluation and treatment. (ECF 1 at 4). Rodriguez faults "Defendants" for refusing to list her in records as

---

[10] The World Professional Association for Transgender Health (WPATH) website describes the organization as a 501(c)(3) non-profit, interdisciplinary professional and educational organization devoted to transgender health. *See* https://www.wpath.org/about/mission-and-vision (visited on February 7, 2019). The Standards of Care, published by WPATH, have established the generally accepted protocols for the treatment of gender dysphoria including (1) hormone therapy; (2) a real-life experience of living as a member of the opposite sex; and (3) sex reassignment surgery. *Jones v. Doe*, Civil Action No. GLR-15-3065 (D. Md. 2016), citing *De'lonta v. Johnson*, 708 F.3d 520, 522–23 (4th Cir. 2013) (citations omitted). Treatment, however, follows a diagnosis of gender dysphoria by a qualified medical or mental health practitioner.

4

transgender and denying her a private shower, panties and bra, and hormone and estrogen treatment. (ECF 1 at 6). She claims the "freeze frame policy has [her] on the verge of committing suicide." (ECF 1 at 6). In *Jones v. Doe*, Civil Action No. GLR-15-3065, she also alleged having suicidal ideations which she attributed to her feelings of identifying as female. In the instant Complaint, she does not allege that she has in fact tried to harm herself or is suicidal.

A mental health assessment and diagnosis of GD is needed for referral for hormone and surgical treatments. Declaration of Bruce Liller, ECF 25-5 ¶4. Once an individual is diagnosed with GD, the generally accepted standard of care provides that treatment may include hormone therapy, living as a member of the opposite sex, and sex reassignment surgery. Liller Decl. ECF 25-5 ¶5. The generally accepted standard of care to treat GD with hormone therapy is: 1) persistent, well-documented gender dysphoria; 2) capacity to make a fully informed decision and consent to treatment; 3) age of majority; and 4) if there are significant medical or mental concerns, they must be reasonably controlled. Liller Decl. ECF 25-5 ¶6.

On December 8, 2015, Liller, a Licensed Clinical Professional Counselor, conducted a diagnostic interview of Rodriguez and concluded she did not meet the diagnostic criteria for GD and is not a transgender inmate as outlined in Executive Directive OPS.131.001 (Declaration of Bruce Liller, ECF 25-5 ¶¶ 8, 10; *see also Jones v. Doe*, Civil Action No. GLR-15-3065 (D. Md. 2016), ECF 27-2). [11] Liller[12] allegedly told Rodriguez at a later and unspecified date that if she wanted an additional evaluation by a transgender specialist, she would have to pay for it. Rodriguez

---

[11] During the interview, Liller had to prompt Rodriguez to discuss her belief she is a woman. Liller noted this is atypical in his experience with gender dysphoria clients in both prison and private settings. *Jones v. Doe*, GLR-15-3065, Diagnostic Interview, ECF No. 20-9. She admitted reading about transgender issues but could not differentiate between what it means to be gay, bi-sexual, homosexual, or transgender. Jones also told Liller she "became" a transgender woman because she was raised by females and did not have a father figure in her life. Liller notes the latter statement is very atypical for persons with gender dysphoria who generally view their development as nature, not nurture. Liller noted that the theme of their discussion centered on her desire to be housed alone to be safe from sexual assault by other inmates. *Id.*

[12] Liller is not a Defendant in this case.

claims she was informed she would not be treated for GD because she had not received treatment "on the street." (ECF 1 at 4).

Liller explains the GD diagnosis process as follows:

> Qualified mental health professionals conduct an assessment for diagnosis forgender dysphoria in the context of an evaluation of their psychosocial adjustment. The evaluation includes assessment of gender identity and gender dysphoria, history and development of gender dysphoric feelings, and the impact of stigma attached to gender nonconformity on mental health. The evaluation may result in no diagnosis, in a formal diagnosis related to gender dysphoria, and/or in other diagnoses that describe aspects of the client's health and psychosocial adjustment. The role of mental health professionals includes making reasonable sure that the gender dysphoria is not secondary to, or better accounted for, by other diagnosis.

Liller Decl., ECF 25-5 ¶3.

Liller explains that Axis I (clinical condition) and Axis II (personality disorders) comorbidity may raise concerns about the validity of self-reported symptoms of a clinical (Axis I) condition. Axis II conditions may lead to symptom exaggerations, false report of symptoms, and contriving symptoms for secondary gain. Liller Decl. ECF 25-5 ¶7.

On December 4, 2015, Dr. Sharon Baucom, Director of Clinical Services for DPSCS stated that after reviewing Rodriguez's medical and mental health file, she determined that Rodriguez did not have a history of GD or receiving hormone treatment in Ohio prior to transfer to Maryland. (ECF 27-4 ¶¶ 4, 6, 12; *see Jones v. Doe*, GLR-15-3065, Decl. of Sharon Baucom, M.D., ECF 6-5 ¶¶ 4, 6, 12.)

Liller states Rodriguez's "clinical picture was dominated by Axis II symptomology which 'clouds' his claims of gender dysphoria." (Liller Decl. ECF 25-5 ¶8). Liller described Rodriguez's actions as "best accounted for by his primary diagnosis of Antisocial Personality Disorder, Narcissistic Personality Disorder, and Posttraumatic Stress Disorder. (Liller Decl. ECF 25-5 ¶8).

On February 2, 2016, a multi-disciplinary team met to discuss Rodriguez's GD concerns. Rodriguez was not diagnosed with GD. (Decl. of Mahboob Ashraf, ECF 27-3 ¶5). The team added a diagnosis of Narcissistic Personality Disorder to her record. After reviewing Rodriguez's severe Axis II co-morbidity, historical factors, history of acting out in multiple ways, and the absence of community treatment records (including evidence of a GD diagnosis or treatment for GD prior to transfer to NBCI), the team ruled out a diagnosis of GD. (Liller Decl. ECF 25-5 ¶9). The Regional Gender Dysphoria Committee was scheduled to review Rodriguez's case at its next quarterly meeting.[13] This review was to include input from Dr. Chris Kraft, Director of Clinical Services, Sex and Gender Clinic at the Johns Hopkins School of Medicine. (Liller Decl. ECF 25-5 ¶10). Rodriguez's current diagnosis is Episodic Mood Disorder, Antisocial Personality Disorder, Narcissistic Personality Disorder, and Posttraumatic Stress Disorder. (Liller Decl. ECF 25-5 ¶9).

## II.     SAFETY AND HOUSING

Rodriguez alleges the "freeze frame" policy endangers her safety. (ECF 1 at 5). Rodriguez asserts that she was "forced" to find a cellmate or be placed "in a cell with anyone." (ECF 1 at 5). Rodriguez chose Brandon Thompson as her cellmate. She asserts that two weeks later, Thompson assaulted and threatened to kill her. Rodriguez went to the shower and refused to return to the cell. She was placed on suicide watch. She alleges next day Warden Bishop instructed Sergeant Thomas to put her in another cell and was forced again to choose a cellmate. This time she chose Derek Jones. Two month later, Derek Jones allegedly informed Rodriguez that gang members, who are not named, ordered him to kill Rodriguez. Derek Jones recommended Rodriguez move to a different cell, which she did. Rodriguez states she was moved to a

---

[13] The date of that meeting or its decision is not in the record.

contingency cell as retaliation, although she does not allege what prompted the purported retaliation or the date of her move. (ECF 1 at 5).

The State Defendants dispute Rodriguez's assertions of danger. Case manager Tichnell states there have been no documented threats or violence directed toward Rodriguez from past or current cellmates. (Tichnell Decl. ECF 25-4 ¶ 11). Warden Bishop denies ever ordering Rodriguez placement in a single or double cell, and states that housing assignments are determined by the Housing Unit Manager based on the needs of the housing unit and its inmate residents. (Bishop Decl. ECF 25-2 ¶¶ 14-15).

On July 12, 2016, Rodriguez was assaulted in a medical holding cell by Tony Gater and Ricky Horton, whom she claims are two well known gang members of the Bloods.( ECF 1 at 5; Tichnell Decl., ECF 25-4 ¶11). The inmates stopped fighting when a correctional officer ordered them to stop. (Notice of Rule Violation, ECF 25-3 at 5, 6, 7). All three inmates were offered medical treatment and refused. (ECF 25-3 at 5, 6, 7). Gater and Horton, who were not listed as Rodriguez's verified enemies at the time of the assault, were added to her enemies' list. (Tichnell Decl., ECF 25-4 ¶11). On April 19, 2018, Rodriguez signed an Enemy Retraction Form to verify that Gater and Horton are not his enemies and they should be deleted from his Enemy Alert Screen. (Tichnell Decl., ECF 25-4 ¶14). Tichnell states he did not work at NBCI or have prior knowledge that Gater and Horton would assault Rodriguez. (Tichnell Decl., ECF 25-4 ¶14).

Bishop states Rodriguez housing has been effectively managed by finding suitable alternatives to placement on Protective Custody. (Bishop Decl. ECF 25-2 ¶18). Rodriguez was placed in Housing Unit 1 C-Tier, which has all single cells, for almost ten months before he was assaulted in the medical room on July 12, 2016 by Gater and Horton, and she remained on C-Tier for five months afterward. (Bishop Decl. ECF 25-2 ¶¶14, 15). Rodriguez was celled in Housing

Unit 1 C-Tier on: July 2, 2015- July 7, 2015; September 29, 2015- February 6, 2017; February 18, 2017- July 7, 2017; and November 7, 2017-November 1, 2018. (Bishop Decl. ECF 25-2 ¶15). Rodriguez was moved to Housing Unit 1 B-Tier after receiving an infraction for possessing, misusing, tampering with, damaging or destroying security equipment or property and moved back to C-Tier on July 7, 2017 when her disciplinary segregation period ended. (Bishop Decl. ECF 25-2 ¶16). Rodriguez returned to disciplinary segregation on July 25, 2017, after receiving multiple rule infractions.

Rodriguez claims she is in danger in the medical room when she is around other inmates who are gang members or Muslim,[14] and is in danger generally because inmates can slip out of their handcuffs and attack. ECF 1 at 5. Rodriguez alleges that she lives in fear, has become paranoid, and exits her cell only for showers and sick call. ECF 1 at 6. Rodriguez asserts she expressed her fears to Tichnell and requested placement on protective custody, but he refused her request. ECF 1 at 5. Tichnell denies that Rodriguez asked him to consider her for protective custody or complained she was being threatened. Tichnell Decl. ECF 25-4 ¶6.

Rodriguez is on Disciplinary Segregation until September 11, 2019.[15] Tichnell Decl. ECF 25-4 ¶5. In disciplinary segregation, she can meet with staff at least monthly to address concerns, is separated from general population inmates, is handcuffed and escorted by correctional staff when outside her cell, showers alone, may enter recreational enclosures only with an assigned cell partner, and is closely monitored. (Tichnell Decl. ECF 25-4 ¶¶ 5, 6, 16). Once Rodriguez completes her term of disciplinary segregation sentence, corrections staff will closely examine her

---

[14] In her "Supplement Complaint" Rodriguez states she is a Muslim. ECF 3.
[15] Rodriguez has been on disciplinary segregation since July 25, 2017, for assault or battery on staff (Rule 101), use intimidation, coercive, or threatening language (Rule 104), refusing or failing to provide urine for analysis or providing a diluted sample for testing (Rule 115), possessing, misusing, damaging or destroying security equipment or property (Rule 116), disobeying a direct order (Rule 400), and using disrespectful or vulgar language (Rule 405). She was moved to Housing Unit 1A-Tier to serve her term of disciplinary segregation. (Bishop Decl. ECF 25-2 ¶17).

housing placement. (Tichnell Decl. ECF 25-4 ¶ 5). Tichnell notes that Rodriguez has one verified enemy within the DPSCS, and that inmate is not housed at NBCI. Rodriguez currently shares a cell with inmate Gary Cooper. Tichnell Decl. ECF 25-4 ¶8.

There have been no verified sexual assault claims made by Rodriguez. Tichnell Decl. ECF 25-4 ¶ 10. In 2015, the Internal Investigation Division (IID) investigated a PREA (Prison Rape Elimination Act)[16] claim Rodriguez made and found it unsubstantiated. (Bishop Decl. ECF 25-2 ¶18; Tichnell Decl. ECF 25-4 ¶10; *see also Jones v. Doe*, ECF 27-2; PREA Investigation Rep ECF20-12 at 5-8, 17-20). As noted, have been no documented threats or incidents of violence directed toward Rodriguez from past or current cellmates. Tichnell Decl. ECF 25-4 ¶ 11.

## STANDARD OF REVIEW

Because Rodriguez is self-represented, this Court liberally construes his pleadings and holds them to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

A court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). If it does so, "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Therefore, a motion styled in this manner implicates a court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." *Sager v. Hous. Com'n of Anne* Arundel Cty., 855 F. Supp. 2d 524,

---

[16] PREA is codified at 42 U.S.C. §15601 *et seq.*

542 (D. Md. 2012) (quoting 5C Wright & Miller, *Federal Practice & Procedure* § 1366, at 159 (3d ed. 2004, 2011 Supp.)).

Defendants have filed Motions to Dismiss or, in the Alternative, for Summary Judgment supported with exhibits and declarations. (ECF 25, 27). Because the Court will consider these exhibits and declaration, Defendants' Motions will be treated as Motions for Summary Judgment.

Under Federal Rule of Civil Procedure 56(c), a court must grant summary judgment if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson*, 477 U.S. at 248). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the court must take all facts and inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The party opposing summary judgment must, however, "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). The non-movant " 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.' " *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e) ); *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160 (1970). A court should enter summary judgment when a party fails to make a showing sufficient to establish elements essential to a party's case, and on which the party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322-23.

11

## DISCUSSION

## I.     CLAIMS AGAINST THE STATE DEFENDANTS

The State Defendants assert they are entitled to summary judgment on several grounds: 1) they are immune from claims against them in their official capacities; 2) Rodriguez has not exhausted her administrative remedies; 3) they cannot be held liable under the doctrine of respondeat superior; 4) their actions do not constitute deliberate indifference to Rodriguez's health and safety; and 5) they are entitled to qualified immunity.[17]

### A.  ELEVENTH AMENDMENT IMMUNITY

Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Also barred by the Eleventh Amendment are claims brought against state employees in their official capacity because a suit against a state officer in his official capacity is tantamount to a suit against the state itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985).

Rodriguez is suing Defendants in their official and individual capacities. (Compl. ECF 1 at 3). Regarding the claims against Defendants in their official capacity, the

> the state is the real, substantial party in interest. . . . Thus, "[t]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." . . . And, as when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief. . . .

*Pennhurst State Sch. & Hosp.*, 465 U.S. at 101-02 (citations omitted). Therefore, because Defendants are immune from suit for any claims against them in their official capacity, those claims will be dismissed.

---

[17] Because summary judgment is appropriate on other grounds noted herein, this Court will not address the State Defendants qualified immunity defense.

## B. ADMINISTRATIVE EXHAUSTION

Defendants raise the affirmative defense that Rodriguez has failed to exhaust his administrative remedies. Under the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134 § 803, 110 Stat. 1321 (1996) (codified as amended at 42 U.S.C. 1197(e)(a)):

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) (2018). Inmates must exhaust administrative remedies before they bring any "suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

Exhaustion is mandatory and generally may not be excused unless the administrative procedure is not available. *See Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) (holding that an inmate "must exhaust available remedies, but need not exhaust unavailable ones"). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo,* 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford* 548 U.S. at 93 (quoting *Pozo v. McCaughtry,* 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original). But, the court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell,* 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp,* 458 F.3d 678, 684 (7th Cir. 2006). "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette,* 517 F.3d 717,

725 (4th Cir. 2008). In *Ross*, the United States Supreme Court identified three circumstances when an administrative remedy is unavailable. An administrative procedure is not available when officers are consistently unwilling or unable to provide relief to aggrieved inmates, the procedure is so opaque that it is practically incapable of use, or prison administrators actively thwart inmates from filing grievances. *Ross*, 136 S. Ct. at 1859-60.

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the Inmate Grievance Office ("IGO") against any DOC official or employee. C.S. § 10-206(a). However, if the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process, before filing a grievance with the IGO. *See* C.S. § 10-206(b). There is an established administrative remedy procedure process that applies to all Maryland prisons. COMAR 12.02.28.01 *et seq.* Therefore, when the ARP process provides a possible remedy, it must be followed and completed before an inmate may file a grievance with the IGO.

The ARP process consists of multiple steps. For the first step, a prisoner is required to file his initial ARP with his facility's "managing official" COMAR 12.02.28.02(D)(1), which is defined by COMAR 12.02.28.02(B)(14) as "the warden or other individual responsible for management of the correctional facility" and defined under C.S. § 1-101(k) "as the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility." Moreover, the ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.02.28.09(B).

14

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP or fails to respond to the ARP within the established time frame. The prisoner has 30 days to file an appeal to the Commissioner of Corrections. COMAR 12.02.28.14(B)(5).

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO.[18] COMAR 12.02.28.18; C.S. § 10-206(a); COMAR 12.07.01.05(B). When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. COMAR 12.07.01.04(B)(9)(a). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing." C.S. § 10-207(b)(1); *see also* COMAR 12.07.01.06(B). An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.S. § 10-208; COMAR 12.07.01.07-.08. The conduct of such hearings is governed by statute. *See* C.S. § 10-208; COMAR 12.07.01.07(D); *see also* Md. Code Ann., State Gov't § 10-206(a)(1)

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination. C.S. § 10-209(b)(1)(ii); COMAR 12.07.01.10(A)(2). However, if the ALJ concludes that the inmate's complaint is wholly or partly meritorious, the decision constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* COMAR 12.07.01.10(B); C.S. § 10-209(b)(2)(c).

---

[18]     If the Commissioner fails to respond, the grievant shall file their appeal within 30 days of the date the response was due. COMAR 12.07.01.05(B)(2).

The final agency determination is subject to judicial review in Maryland State court, so long as the claimant has exhausted his/her remedies. *See* C.S. § 10-210. An inmate need not, however, seek judicial review in State court to satisfy the PLRA's administrative exhaustion requirement. *See, e.g., Pozo*, 286 F.3d at 1024 ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court.").

The ARP process does not apply to case management decisions, which are to be directly grieved to the IGO. COMAR 12.02.28.04(B)(1); 12.07.01.04(B)(9)(c). Nor does it apply to Maryland Parole Commission procedures, decisions to withhold mail, or Prison Rape Elimination Act related claims. COMAR 12.02.28.04(B)(2),(4),(5). Those categories of complaints are addressed through separate administrative processes. *Id.*

Finally, the ARP process does not apply to complaints relating to prisoner disciplinary procedures and decisions. COMAR 12.02.28.04(B)(3). If a prisoner is found guilty of a rule violation, the prisoner is entitled to appeal the hearing officer's guilty decision or sanction to the warden of the facility where he or she is incarcerated. COMAR 12.03.01.30(A)(1),(2). If the prisoner does not file a written appeal with the warden within fifteen days of receipt of the hearing officer's decision, he or she is considered to have waived the right to appeal. COMAR 12.03.01.30(A)(3). If the warden affirms the hearing officer's guilty finding or sanction, the prisoner may then appeal to the IGO. COMAR 12.03.01.30(C); *see also* COMAR 12.07.01.05 and .08. When filing this appeal with the IGO, the prisoner is required to include a copy of the initial notice of inmate rule violation, the hearing record, the appeal to the warden, and the warden's response to the appeal. COMAR 12.07.01.04(B)(9)(b).

Rodriguez alleges that she filed an ARP complaining that she was not receiving "treatment on street" and was not receiving it now, which she asserts is "clearly a freeze frame policy."

16

(Compl. ECF- 1 ¶ 17). Rodriguez claims she filed a "new administrative remedy, strictly against the freeze frame policy" and it was dismissed. She claims she sent an "appeal" to the Commissioner and never received a response back from the IGO. (Compl. ECF 1at 1 ¶ 18). Rodriguez does not specify the date of the ARP or when she sent the appeal.[19]

Rodriguez filed two grievances with the IGO pertaining to transgender issues on November 30, 2015, IGO No, 20152261 and IGO No. 20152262. Declaration of Samiyah Hassan, IGO Administrative Officer, ECF 25-6. In both, Rodriguez complained that she wanted to be treated with respect, that she needed various personal care/hygiene items, and that she wanted a medical diagnosis and treatment for gender identity disorder. *Jones v. Doe*, Civil Action No. GLR-15-3065, ECF 20-13, Declaration of Russell Neverdon, IGO Executive Director ¶¶ 3(a)-(b). On February 3, 2016, the IGO sent Rodriguez a letter requesting that she provide a brief statement of the nature of her grievances including supporting documentation within thirty days. The IGO indicated that if Rodriguez failed to respond within this time, the grievance would be administratively dismissed without further notice. *Jones v. Doe*, Civil Action No. GLR-15-3065, ECF 20-13, Neverdon Decl. ¶¶ 3(a)-(b); Hassan Decl. ECF 25-6 ¶3(a)-(b). Rodriguez did not respond to the IGO letters. On March 3, 2016, the IGO administratively dismissed IGO No, 20152261 and IGO No. 20152262. (Hassan Decl. ECF 25-6 ¶3(a)-(b)). There is no record that Rodriguez pursued judicial review in Maryland Circuit Court. (Hassan Decl. ECF 25-6 ¶3(a)-(b)).

On December 11, 2015, Rodriguez filed IGO No. 20152363, complaining that Case Manager Bryan Hoffman ignored her multiple requests for protective custody housing. The IGO administratively dismissed the grievance on March 25, 2016, after Rodriguez failed to respond to

---

[19] On December 11, 2015, Rodriguez filed ARP NBCI 2527-15, in which she requested estrogen and hormone treatment. *Jones v. Doe*, Civil Action No. GLR-15-3065, ECF 20-10 at 44. After investigation, it was determined that Rodriguez "was not on treatment before entering the prison system" and she does not have a "diagnosis for treatment as of now." *Id.* As noted, there is no record Rodriguez pursued further exhaustion of this ARP.

the IGO's February 25, 2016 letter directing him to provide within thirty days copies of all related case management paperwork and supporting documentation required by COMAR 12.07.01.04(B)(9)(c) and cautioning that failure to provide this information within this time would result in dismissal without further notice. (Hassan Decl. ECF 25-6 ¶3). There is no record that Rodriguez pursued judicial review in Maryland Circuit Court. (Hassan Decl. ECF 25-6 ¶3).

Even when the facts are viewed in the light most favorable to Rodriguez, she did not properly exhaust claims concerning transgender treatment or safety. When the IGO asked her to clarify the multiple issues in her grievances and provide supporting documentation, she failed to do so. Rodriguez does not assert the administrative process was opaque, correctional staff thwarted her efforts to access the process, or it was otherwise unavailable to her.

Accordingly, Rodriguez has failed to exhaust her claims and Defendants are entitled to summary judgment in their favor. Further, even if these claims were administratively exhausted, Rodriguez claims are unavailing on other grounds.

## C. RESPONDEAT SUPERIOR

To establish liability under 42 U.S.C. § 1983, the defendant must be personally involved in the alleged violation. *Vinnedge v. Gibbs*, 550 F.2d 926. 928 (4th Cir. 1977); *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994); *see also Rizzo v. Goode*, 423 U.S. 362. 370-71 (1976). Under certain circumstances, supervisors and administrators may be held culpable under principles of supervisory liability. *See Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001). To show supervisory liability, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practice,' and (3) that there was an

18

'affirmative causal link' between the supervisor's inaction and the particular
constitutional injury suffered by the plaintiff.

*Shaw,* 13 F.3d at 799 (4th. Cir. 1994) (citations omitted).

Rodriguez alleges no facts suggesting that Hogan, Kopp, Moyer or Corcoran were
personally involved in decisions about his GD evaluation or treatment, housing, or safety. Instead,
Rodriguez faults them as supervisors responsible for the "overall" operation of the state,
department, or correctional facility.[20] (ECF 1 ¶¶ 4 5,7,8). Rodriguez also filed a copy of a claim
form he filed on December 12, 2017 addressed to Kopp, in which he seems to reference this case.
ECF 1-1.

A supervisor must have actual or constructive knowledge that his subordinate's behavior
posed a "pervasive and unreasonable risk" of constitutional harm. *Shaw,* 13 F.3d at 799. Conduct
is "pervasive and unreasonable" if it "widespread," or has at least occurred "on several different
occasions." *Randall v. Prince George's Cnty.,* 302 F.3d 188, 206 (4th Cir. 2002). A supervisor's
constructive knowledge of the risk "can be alleged in multiple ways, including the existence of
written reports of conditions at a detention facility, or a supervisor's high level of responsibility
coupled with the violations alleged to have occurred on her or his watch." *Jones v. Murphy,* 470
F.Supp.2d 537, 546 (D. Md. 2007). It is also true that liability under § 1983 "depends on each
defendant's knowledge and actions, not on the knowledge or actions of persons they supervise";
selecting defendants on the assumption that everyone "higher up the bureaucratic chain" from
those who knew of a constitutional violation is a "bad" approach. *Burks v. Raemisch,* 555 F.3d
592, 593 (7th Cir. 2009).

---

[20] Rodriguez sued Hogan and Kopp in their official capacities only. As earlier discussed, her claims against them in
their official capacities are barred by Eleventh Amendment immunity.

Viewing the allegations in the light most favorable to Rodriguez, her allegations are insufficient to suggest Hogan, Kopp, Moyer or Corcoran had actual or constructive knowledge of the actions of subordinates in the matters at issue here to impose supervisory liability. Hogan, Kopp, Moyer, and Corcoran are entitled to summary judgment in their favor as a matter of law. This Court shall now proceed to the claims against the remaining Correctional Defendants, Warden Bishop and Case Manager Tichnell.

## D. EIGHTH AMENDMENT CLAIMS

The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (1996). "In order to make out a prima facie case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993) (internal quotation omitted). The first part of the standard is objective, an inmate must show that "the deprivation of [a] basic human need was objectively sufficiently serious." *Id.* (internal quotation omitted). In the medical context, a basic human need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

The second part of the standard is subjective, a prisoner must show that "subjectively the officials acted with a sufficiently culpable state of mind." *See Strickler,* 989 F.2d at 1379 (internal quotations omitted). The mental state for "deliberate indifference entails something more than negligence, ... [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan,* 511 U.S. 825, 835

20

(1994). "It requires that a prison official know of and disregard the objectively serious condition, medical need, or risk of harm." *Shakka v. Smith,* 71 F.3d 162, 166 (4th Cir. 1995); *see Farmer,* 511 U.S. at 837. A plaintiff therefore must establish the prison official's "actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by [the official's] action or inaction." *Jackson v. Lightsey,* 775 F.3d 170, 178 (4th Cir. 2014) (citing *Farmer,* 511 U.S. at 837–39). The subjective knowledge requirement can be proved "through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge...." *Scinto v. Stansberry,* 841 F.3d F.3d 219, 225–26 (4th Cir. 2016). Deliberate indifference poses "a particularly high bar to recovery." *Iko,* 535 F.3d at 241.

## 1. GENDER DYSPHORIA

To prevail on a constitutional claim for denial of medical care, an inmate must demonstrate that a defendant's acts or omissions amounted to deliberate indifference to her serious medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There is no distinction between the right to medical care for physical ill and its psychological and psychiatric counterpart. *Bowring v. Goodwin,* 551 F.2d 44, 47 (4th. Cir. 1977). Mere disagreement with the prescribed treatment or, even, medical malpractice, does not rise to the level of deliberate indifference to prove a constitutional claim. *See Estelle,* 429 U.S. at 103; *Wright v. Collins,* 766 F.2d 841, 849 (4th Cir. 1985); *see also Peterson v. Davis,* 551 F.Supp. 137, 146 (D. Md. 1982), aff'd, 729 F.2d 1453 (4th. Cir. 1984) (stating a prisoner's disagreement with a prescribed course of treatment does not establish deliberate indifference and, therefore, does not state a claim).

Prison officials may rely on the expertise of medical providers. *See Shakka v. Smith,* 71 F.3d 162, 167 (4th Cir. 1995); *see also Miltier v. Beorn,* 896 F.2d 848, 854-55 (4th Cir. 1990)

21

(supervisory prison officials may rely on professional judgments of medical providers but may be found deliberately indifferent based on intentional interference in an inmate's medical care.

Rodriguez allegations that Warden Bishop is deliberately indifferent to her serious medical needs and unsafe conditions (Compl. ECF 1 ¶33) are conclusory, lack factual support, and are contradicted by the evidence in the record. The evidence demonstrates that Rodriguez was evaluated by Liller, a mental health professional, and determined not meet multiple criteria,including prior history and treatment for GD. Her claim centers on her belief that there is a freeze frame" policy that holds if a person did not receive treatment "on the street," treatment will not be provided in prison (ECF 1¶ 14) Warden Bishop denies there is a "freeze frame" policy in the DOC.[21] (Bishop Decl., ECF 25-2 ¶12). Liller's description of the GD evaluation process makes clear that multiple criteria are used to diagnosis the condition, not only whether treatment preceded incarceration. Liller's evaluation was reviewed and approved by the multi-disciplinary team that met to discuss Rodriguez's GD concerns. The diagnosis was also scheduled for review by the Regional Gender Dysphoria Committee with input from Dr. Chris Kraft, Director of Clinical Services, Sex and Gender Clinic at the Johns Hopkins School of Medicine. Rodriguez may disagree with the results of the evaluation and diagnosis, but his disagreement does not amount to a violation of constitutional dimension.

Warden Bishop and Case Manager Tichnell are not trained as a mental or medical health care providers and have no authority to influence the decisions of health care providers. Bishop Decl. ECF 25-2 ¶¶6, 7; Tichnell Decl. ECF 24-4 ¶¶ 17, 18. It is beyond the scope of their duties and responsibilities to perform or prescribe a course of medical or mental health treatment for an

---

[21] In *Jones v. Doe*, Judge Russell noted that hormonal therapy may be initiated during incarceration upon diagnosis with gender dysphoria, citing as an example *Arnold v. Wilson*, No. 1:13cv900 (LMB/TRJ), 2014 WL 7345755 (E.D.Va. Dec. 23, 2014) (involving transgender woman whose diagnosis and treatment began while incarcerated).

inmate. Bishop Decl. ECF 25-2 ¶6; Tichnell Decl. ECF 24-4 ¶¶ 17, 18. Diagnosis of inmate mental health issues are made by licensed mental health professionals. Bishop Decl. ECF 25-2 ¶9. Bishop declares that he has "not been involved in, interfered with, or delayed the provision of mental health care to inmate Michael Jones [Rodriguez]" Bishop Decl. ECF 25-2 ¶8. Tichnell alsodenies ever being involved in, interfering with, or delaying medical or mental health care to Rodriguez. Tichnell Decl. ECF 24-4 ¶ 19. They are entitled to rely on the professional judgment of mental health practitioners. Rodriguez provides no facts to show Bishop or Tichnell, neither of whom is a medical or mental health professional, acted with deliberate indifference to deny her evaluation or treatment for GD. (ECF 24-4 ¶¶ 17, 18). Bishop and Tichnell are entitled to summary judgment in their favor as to this claim.

## 2. FAILURE TO PROTECT

The right to be free from cruel and unusual punishment includes the right to be protected from a substantial risk of serious harm at the hands of other inmates. *See Farmer*, 511 U.S. 825, 833 (1994); *Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015). Accordingly, the "Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 832). These duties include maintaining "reasonable measures to guarantee the safety of the inmates." *Id.* (quoting *Farmer,* 511 U.S. at 832). However, "not every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834.

Defendants refute Rodriguez's claims of danger with verified evidence. None of her claims of threats or violence from cellmates has been substantiated. Her PREA claim was investigated and determined unsubstantiated. There is only one record of an attack on Rodriguez: Gater and

Horton's assault. That incident appears to have been spontaneous since these inmates were not Rodriguez's verified enemies at the time of the attack. Importantly, Rodriguez does not allege she notified correctional staff about safety concerns specific to Gater or Horton prior to the incident.

Tichnell was not employed at NBCI at the time of the assault, and Bishop was not involved in specific cell placement for Rodriguez, as housing assignments are made by the housing unit manager. Rodriguez, who has a history of poor institutional adjustment, will remain in disciplinary segregation where she will be escorted by correctional officers when outside the cell and will shower alone. On September 11, 2019, her housing status will be reviewed. Even when her allegations are viewed in the light most favorable to her, Rodriguez does not establish Bishop or Tichnell acted with requisite objective and subjective deliberate indifference to her safety, and they are entitled to summary judgment as a matter of law.

### E. EQUAL PROTECTION

Rodriguez asserts Tichnell denied her rights under the Equal Protection Clause, but provides no further facts or explanation in support. (Compl. ECF 1 ¶34). She does not allege any other Defendant violated her right to equal protection. (Compl. ECF 1).

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (citation omitted). Rodriguez does not assert Tichnell has treated her differently from other self-reported transgender inmates, or otherwise alleges facts support an Equal Protection claims. Accordingly, Tichnell will be granted summary judgment as to this claim.

## II.    CLAIMS AGAINST DR. ASHRAF

Rodriguez alleges he has requested "multiple times" to be evaluated and treated by Dr. Ashraf for GD, but Ashraf refuses to evaluate her. (ECF 1 at 4). Dr. Ashraf is an internal medical physician, not a psychiatrist, psychologist, or counselor. As such, he does not diagnose patients with GD or recommend a course of treatment for patients diagnosed with GD. Dec. of Mahboob Ashraf, ECF 27-3 ¶3. Ashraf declares "if a patient complains of gender dysphoria or reports symptoms that are consistent with gender dysphoria, I cannot diagnose this condition.... Instead, I must refer the patient to a qualified specialist" for diagnosis and treatment. Dec. of Mahboob Ashraf, ECF 27-3 ¶4.

As discussed above, Rodriguez was evaluated by Liller, a licensed clinical counselor in 2015, who found she does not meet the criteria for a GD diagnosis. Accordingly, there has been no course of treatment for Rodriguez for this condition. Dr. Ashraf is not a mental health practitioner or specialist qualified to treat patients with GD. Thus, his refusal to agree to Rodriguez's requests for evaluation and treatment does not equate deliberate indifference to Rodriguez's medical or mental health needs. Ashraf has countered Rodriguez's claim to show there is no genuine dispute as to a material fact and is entitled to summary judgment in his favor.

## CONCLUSION

For these reasons, this Court will by separate Order GRANT Defendants' Motions for Summary Judgment (ECF 25, 27).

February 12, 2019

_RICHARD D. BENNETT_
RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE